We'll proceed with the argument on the first case. Clark v. Coca-Cola Beverages Northeast, Inc. Mr. Oliveira? Yes, Your Honor. Whenever you're ready. I see you have one minute reserved for rebuttal. Yes. Good morning. May it please the Court. My name is Carlo de Oliveira, and I represent the plaintiff appellant on this appeal. I'd like to begin by discussing some of the records created and produced by the defendants, as well as statements, which are admissions, made by defendant's officers and employees. I wonder, at some point, it might be helpful to me, and you never know my colleagues as well. The question here is a summary judgment, presumed right, summary judgment manner. To summarize what the issues of fact are that prevent, or should, in your view, prevent us from affirming the summary judgment. Just to summarize what those factual issues are might be very helpful. Absolutely, Judge Sack, and that's what I was about to do. First, in terms of positions that were available in a warehouse. There were several positions available in a warehouse during the period relevant to this case. If you, I direct the Court to pages 119 through 123 of the Joint Appendix. And you can see there that there were at least, that there was a position of inventory checker, which is a light duty position. Which according to the branch manager of defendant's warehouse, it's a position where heavy lifting was not an essential function of the job. And that position was available according to defendant's own documents. Am I right that that's not a bargaining unit position? That is correct, Your Honor. That is a non-bargaining unit position. So any arguments with respect to the collective bargaining agreement as to prevent- Well, did the plaintiff ever indicate a willingness to take such a position and give up his union membership? Did he ever apply for that job? Absolutely, Your Honor. And there is testimony that on November 28th, 2017, plaintiff, Mr. Clark, specifically requested Ms. Devine, which was the branch manager and supervisor Johnson, for that position. There is testimony and also there is a record- Where do I find that? I'll direct, Your Honor, to page- If you've got it, that's fine. If you don't, maybe you can find it during the break when your adversary is speaking and get it for us for rebuttal. I don't want to take up your time. Yes, but there are emails from Ms. Johnson which she acknowledges that Mr. Clark had contacted her and asked for a light duty position, which is the inventory checker position. Well, wait. There's a difference between requesting light duty and requesting a specific position. So what I'm looking for is any indication that he requested the inventory checker position or applied for a job that was outside the bargaining unit. And I will find this page and I'll provide it to you in rebuttal. Thank you. That is in an affidavit by my client that on November 28th, in conversations with Ms. Devine, he asked to be returned to a position light duty and he specifically referenced the inventory checker position. Nonetheless- Let me just ask you. I thought that position essentially has the same physical job functions as the general warehouse position. That's at the appendix 512, isn't that- That is incorrect, Judge Bianco. And that's what the trial court found. However, if you look at the testimony of the branch manager herself, Ms. Devine, she testified that the inventory checker position did not have heavy lifting as an essential function of the job. That is on page 181 of the record. And also, the position that the trial, the description, the job description that the trial court relied on, which is on page 523 of the record, is a general description of warehouse positions. But if you look at the description, there's nowhere under the essential duties of the position does that describe a requirement that the employee be able to lift over 50 pounds. That is a job requirement. And as I explained in my brief, there is a difference between an essential function and a job requirement. Whereas an essential function, an employee- controls that if they don't use the word essential function, that you can't- that therefore does not qualify as an essential function. We've never said that. We've said the opposite, that you look at multiple factors to determine whether something is an essential function of the job or not, right? Correct, Your Honor. And the regulations also go into details as to what an essential function means. And we explain in our brief as to why the real differences- and at least five products weigh over 50 pounds. Why wouldn't the conclusion be that that's an essential function of the job, to be able to lift those types of weights? Well, I think that the analysis, Your Honor, should be, first of all, were there positions available in a warehouse? And if the record shows that there were positions available for which the defendant could have possibly accommodated Mr. Clark to perform, then the question is, did the employer interact in good faith with Mr. Clark to determine whether he had any limitations that prevented him from performing any of those jobs? Let's take a step back. Correct me if I'm wrong. It's undisputed that he was 100 percent disabled until at least December 6th, correct? No, Your Honor. He was temporarily totally disabled until December 6th. All right. Okay, and then he was limited to jobs involving no pushing, pulling, or lifting greater than 20 pounds occasionally from that date until January 15th, correct? Correct. That is correct. And then from that point on, he was restricted to no lifting greater than 50 pounds, correct? Correct. So how could he qualify for that position? Now, let me direct the Court to Page. There was a functional capacity analysis ordered by the defendant which was performed in September 2017. In that evaluation, the evaluator specifically mentioned that Mr. Clark was able to perform a position of inventory checker position. And that documentation was in possession of the employer. At the time, he requested an accommodation. What are you referring to, Kitty? Who is that from? That is a functional capacity evaluation that was performed at the request of Coca-Cola. And in that document, it shows that Mr. Clark was able to perform the essential function. It's on Page 154 of the appendix. And there, the evaluator who did perform the work assessment says, there is a light-duty position of product checker that may be available which he could perform as he states his position does not require lifting. That's on Page 154 of the record. That was in September 2017. So as of September 2017, Mr. Clark was able to perform at least the inventory checker position. As of December 6, 2017, he was able to be returned to his previous position of yard jockey position, which again... This is a position of product checker, according to that document. Yes, inventory checker. No, it says product checker. Is that the same thing? That is the same position, Your Honor. And how do we know that? Because that is the position that Mr. Clark requested in his meeting on November 28. And I will provide the page on the record where the conversation happened. You can give us... It's on Page 227 of the record, Your Honor, which is my client's affidavit on paragraph 22. He says that during that call, he asked to perform the inventory checker position. I have that on Appendix Page 231. Is this the problem? I think at some point there was a corrected document, and I thought that was a corrected brief rather than a corrected appendix. No, it's a corrected brief, Your Honor. So I'm looking at the... Paragraph 22 is on Page 231 of the joint appendix. Based on the copy that I have. That appendix, I think, Your Honor, was amended after the fact. And it was... I'm looking at docket number 38. So there's a new appendix, not just a new brief. What docket number are you looking at, Your Honor? I'm looking at the appendix that I have. I don't know what document number it is. Yes, I apologize. The docket number that I'm looking at is docket number 38, which is the final appendix that was filed. So in that docket... This is not the one dated February 25th, 2021. Yes, February 25th, 2021. Well, I'm looking at it, and it doesn't matter, except that each time you've cited a page, I haven't been able to find it. Except that when you said paragraph 22, that made me able to find it, and it's a few pages off from what you said. I'm sorry for the confusion, but that's what it is. I apologize. I apologize for that, Your Honor. I really don't know what happened. But I see that my time is up. May I just make a final... Go ahead, 30 seconds. I believe that a careful review of this record will show that the defendant violated plaintiff's rights under the ADA in three different ways. One is having shown the positions where they could have been accommodated, and they failed to interact in good faith. And the record shows that the defendant deliberately told supervisors and managers not to communicate with plaintiff about his accommodation. They relied on BSNA, which is a third-party provider, to conduct that communication. But if you look, Your Honors, on page 116 of the appendix, which is case notes prepared by this third-provider agency, it shows that the only time this agency ever communicated with Mr. Clark was on January 16th, 2018. And that was to communicate to him that they were about to terminate his position because his leave has exhausted. All right. So... All right. You have some time for rebuttal if you want to make the other points, Mr. Hathaway-Bennett. Thank you. All right. Mr. Bennett, you're up. May the Court be pleased. Before I start my general argument, I would like to address one point regarding the functional capacity examination referenced in September of 2017. That examination was actually conducted on behalf of the prior owner of the facility. And the discussion about the checker and the doctor's record, I don't have it in front of me because my appendix is on my computer locked up downstairs. But what that quote actually says is that the doctor thought he might be able to perform the checker job based on what Mr. Clark was telling the doctor about the job, not based upon the doctor's firsthand knowledge or analysis of the job. It says, he states this position does not require lifting, but this has not been confirmed. Exactly. That's what the doctor says. Thank you. On September 29th of 2017, Coca-Cola Bottling Company of Northern New England, now known as Coca-Cola Beverages Northeast, bought assets from a company named Coca-Cola Refreshments. And as part of that acquisition, Coca-Cola of Northern New England, now known as Northeast, agreed to honor Mr. Clark's remaining seniority right of approximately 100 days, and agreed that it would hire him if, during that time, he was able to return to an open, available bargaining unit position, with or without reasonable accommodation. But it had to happen before the 24 months ran out. During those 100 days, until December the 6th, Mr. Clark was 100% disabled, consistent with what his doctors reported, consistent with what he reported to the Social Security Administration. From December 6th through the end of the 24 months, Mr. Clark's physical capacity was light duty, 20 pounds, no lifting, kneeling, bending, etc. The only, there were no open positions in that time period. There were no open positions posted for application or bid or for hire in that time period. The inventory checker position had been emptied since well prior to acquisition. The former owner operated the inventory checker position with two checkers, and at some point prior to selling the company, reduced the position to one because of the workload in that position. That position remained at one through acquisition. The prior incumbent stayed in that position. No second checker was hired at any time relevant to this matter. Moreover, even though the position... He does point to an advertisement, though, on November 10th, right, of 2017, indicating they were still looking for one, even though they may have been dealing with it in some other manner. It was included on a flyer, but no applications were taken or accepted. No hiring decision was processed. Individuals who were not disabled couldn't apply for that job if they wanted to. There was no filling of that job, no discrimination. In addition... But why does that not create an issue of fact? I mean, you say these things, and there's testimony in the record to support it, but if there is some flyer or advertisement that says we're hiring, that's not good enough to raise a question as to the credibility of the people who say, oh, we weren't really interested in filling that, as opposed to we weren't interested in filling it in the last few days of Mr. Clark's availability. I don't believe it raises a genuine question of material fact, Your Honor, because, in fact, there is no evidence to support that the company ever accepted any applications for that position well through the end of Mr. Clark's seniority and for months, if not years, beyond. But why are you relying on that? I thought your, just to follow up on Judge Lynch's point, I thought your more fundamental argument is even if it was available that he could not do it, right? Isn't that really the point? That's my second argument, which is even so, he could not perform that job because the checker is required to be able to lift in excess of 50 pounds and to climb and kneel and do the similar physical attributes of the general warehouse laborer. And Ms. Devine, contrary to what my opposing counsel said, did not testify that lifting was not an essential function of the checker job. She testified that it was not a primary function of the checker job. In addition to that, we have no evidence to show that Mr. Clark had the ability to do the checker job or that he would have been selected for it had it been open and been hired for it. With respect to the truck jockey position, Mr. Clark is arguing that he should be allowed or should have been considered to be a truck jockey even though the position number one wasn't available at the time and even though the position requires the incumbent to be able to lift up to 70 pounds. But the truck jockey is not a freestanding position. If the court goes to the collective bargaining agreement, the court can satisfy itself that the truck jockey is a set of duties appended to a general warehouse worker position and the incumbent receives a 50 cent premium over the general warehouse rate for being qualified and able to perform those duties. And that's because of the need to move trucks across the highway and the requirement to hold a commercial driver's license to do it. Relying on the dictionary of occupational titles to set a weight limit is not appropriate when the company has its own established weight limit for this specific job. In addition, although Mr. Clark opines that he had a 50 pound weight restriction when working for CCR that enabled him to do this job, two things are important about that opinion. One is there's no support for it in the record other than his own Ipsy Dixit. The only medical records that can be found show that he was released with a 75 pound lifting restriction, which in fact qualified him to be a truck jockey and qualified him to be a general warehouse worker. But in the interim, he had another serious injury, which I would note happened when he claimed he was working as a truck jockey, but during the part of the day where he's expected to be in the warehouse doing general warehouse work. Because I am short on time, I would like to highlight a couple of points. One is that there is no obligation to restructure a job as a reasonable accommodation. And the suggestion that the general warehouse worker job could somehow be split into jobs that had less weight requirements and greater weight requirements not only would be inconsistent with the requirements of the ADA, it would also be in violation of the collective bargaining agreement, which only allows there to be the one position. There's a suggestion in Mr. Clark's brief that somehow the work in the warehouse is performed as teamwork and that somehow employees could work together and somebody could step in and do the heavy work for him. Number one, nothing could be further from the truth. This is a 70,000 square foot warehouse where a group of warehouse workers work individually without direct supervision, one at a time, one man on a forklift, driving around the warehouse, picking product wherever the order requires them to go to find the product to build one pallet at a time. These are not two man teams, they are not multiple person teams. And in addition, the ADA wouldn't require the employer to slow down its operation to have people pulled off their ongoing work in order to be able to assist Mr. Clark, nor would the ADA require my client to assign a second person to assist Mr. Clark. Can I ask you to address, in the minute you have left, the 100% yield policy allegation? I know you said that some of the statements that ex-employees made were not informed, they were not decision makers, but do you want to address that point? The 100% yield policy, Your Honor, is at best a trope. There is a conflation of the terms 100% yield and full duty. The term full duty is a term that is used in this workplace to define regular bargaining unit jobs versus light duty, which would be essentially non-bargaining unit or make work jobs. It is not a policy of 100% yield. And in fact, if the court looks at, in the district court record document 44-17 at page 5, the court will see a very long list of employees at the Albany Sales Center who were reasonably accommodated to return to full duty, but who were not 100% yield. It's a page-long list showing every instance where somebody's alleged 100% full duty was something less than 100% full duty. All right. I think your time is up, Mr. Bannon. Thank you. First, I just want to clarify. Judge Lynch, I was looking at the page number at the bottom of the page, and I think you were looking at the docket number on the top of the page. So I think that's the confusion. But I want to point out— I don't think so, but that's all right. Okay. I want to point out the page 385 in the docket, which is a response to interrogatories by the plaintiff, interrogatory number 2, in which the plaintiff specifically mentions the position checker.  And also the allegation that the branch manager said that the position was not a heavy—it was not a primary position. Heavy lifting was not an essential duty. That's—if it's not an essential duty, then that can easily be accommodated. It inflects—also, the employer— there's record admissions that the employer inflexibly enforced its leave policy. They admitted in their brief that, yes, they terminated Mr. Clark because the CBA required it. That is inconsistent with the law that requires the employer to reasonably accommodate the employee's accommodations. And consistent with this decision in Law of Joy Wilson v. Noco Motor Fuels, which is a decision authored by Judge Sack, there is no evidence in the record that this defendant ever interacted with the plaintiff once he made a request for accommodation. For those reasons— Even if there was no positions available, that wouldn't still—you wouldn't have a claim. Even if there was some issue with the interactive process, if there's no positions available, that would— Your Honor, if there were no positions available, I would agree with you that that is not a violation. However, on this record, if you look at Joint Appendix page 119 through 123, if those records, which were produced and created by the defendant, do not establish that the positions were available, then—and that the employee, in good faith, tried to accommodate those positions. I understand that. Then there is a violation. If you look at the 100 percent yield policy, you claim it was a 100 percent yield policy. How could that be if there's a page full of names of individuals who had disabilities and were reasonably accommodated? How could that be? That is inaccurate, Your Honor. That page does not reflect what counsel just said. And this was produced after, in response to discovery, there was no— I looked at it. On page 372, there is a list of individuals who were returned to work, even though they had disabilities. And if you look at those dates, Your Honor, those are all after my client was terminated in February 2018. The individuals that have supposedly been accommodated, they were after Mr. Clark was terminated. All right. All right. Thank you. Thank you both for reserved precision. Have a good day. Thank you. Thank you.